# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

JENNIFER K.,

                                        Plaintiff,

        v.                                              3:18-CV-628
                                                        (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

---

PETER GORTON, ESQ., for Plaintiff
DANIEL TARABELLI, ESQ., Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER
United States Magistrate Judge

## MEMORANDUM-DECISION AND ORDER

This matter was referred to me, for all proceedings and entry of a final judgment,
pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in
accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y.
Local Rule 73.1 and the consent of the parties. (Dkt. No. 4.)

## I.    PROCEDURAL HISTORY

Plaintiff filed a Title II application for a period of disability and disability
insurance benefits on April 15, 2015. (Transcript ("T.") at 157-58, 167-69.) In her
application, plaintiff alleged a disability onset date of October 1, 2011. *Id.* Her initial
application was denied on June 26, 2015, and plaintiff timely requested a hearing
before an Administrative Law Judge ("ALJ") on July 10, 2015. (T. 65, 76-80, 83-84.)
Plaintiff appeared with her attorney, Peter Gorton, and testified at a hearing on July 14,
2017, before ALJ Shawn Bozarth. (T. 32-64.) Robin Cook, an impartial vocational
expert ("VE"), also appeared and testified at this hearing. *Id.* On August 1, 2017, ALJ

Bozarth found that plaintiff was not disabled. (T. 17-27.) Plaintiff requested a review of the ALJ's decision, which the Appeals Council denied on May 3, 2018. (T. 1-9.) ALJ Bozarth's opinion thus became the final decision of the Commissioner. (T. 1-4.)

## II. GENERALLY APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months….." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hire if he applied for work

42 U.S.C. § 1382(a)(3)(B). The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is

whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled with-out considering vocational factors such as age, education, and work experience… Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

### B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin. Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review, "even more so than the 'clearly erroneous standard.'" *Brault,* 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include

that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255,258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze ever piece of conflicting evidence in the record. *See, e.g., Monguer v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (Finding we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "pick and choose evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112 (W.D.N.Y. Dec. 6, 2010).

## III.  FACTS

On the date of her administrative hearing, plaintiff was thirty-four years old. (T. 25.) Plaintiff left high school after eleventh grade and later obtained her G.E.D. (T. 37.) Prior to the alleged onset of disability on October 1, 2011, plaintiff variously worked as a telemarketer, home attendant, and crew leader. (T. 25, 54-60, 157-58.) At the time of her hearing, she lived with her husband, her ten-year-old step-daughter, and her three children, ages thirteen, seven, and five. (T. 39.)

Plaintiff claimed disability due to: generalized anxiety disorder, major depressive disorder, bipolar disorder, posttraumatic stress disorder ("PTSD"), and panic disorder. (T. 19.)  Plaintiff's application for disability benefits listed only depression and anxiety

as bases for disability. (T. 171). She also alleged obesity and plantar fasciitis.[1] (T. 20.) However, at the hearing plaintiff's counsel stated that plaintiff's disabling impairments were all non-exertional in nature. (T. 37-38.)

In the course of her psychological treatment, plaintiff described a long history of trauma to Dr. Mary Anne Moore, Psy. D.; Dr. Jill Krilov, M.D.; and Dr. Cheryl Scott-Richard, Psychologist. Plaintiff reported being abused as a child, and struggled with anti-social behavior after witnessing the death of her father at age sixteen. (T. 238, 253-56, 270.) These behavioral problems included fighting and making a bomb threat, and ultimately resulted in plaintiff leaving high school. (T. 238.) Plaintiff's relationship with the father of her three children was described as "abusive," and plaintiff suffered repeated physical abuse that caused her to fear for her life. (T. 253-56, 270.) Plaintiff later witnessed the death of her grandmother. (T. 273.) In 2006 and again in 2011, plaintiff lost her home and belongings to floods. (T. 270, 273.) This resulted in a period of homelessness during which plaintiff received no mental health treatment. (T. 41.) In 2015, plaintiff was arrested for possession of marijuana and jailed for sixteen days. (T. 253-56.)

Beginning on February 2, 2015, plaintiff sought treatment from Nurse Practitioner ("NP") Sheila Robbins. (T. 230.) Plaintiff complained of fatigue, difficulty concentrating, excessive worry, and depressed mood. *Id.* Plaintiff described functioning as "very difficult" and reported that her psychological impairments were aggravated by

---

[1] At the hearing, the ALJ raised the issue of plantar fasciitis surgery, but plaintiff's counsel conceded that the surgery may have been after the Date Last Insured ("DLI"), and that this was essentially "a non-exertional case." (T. 37). The ALJ stated that the plantar fasciitis would not have been considered a severe impairment. (*Id.*)

the recent death of her mother. *Id.* Ms. Robbins prescribed Wellbutrin, which plaintiff reported gave her some relief. (T. 226, 230.)

On June 1, 2015, plaintiff was evaluated by Dr. Mary Ann Moore, Psy. D., a consultative examiner. (T. 238-43.) Plaintiff reported previous psychiatric hospitalization and depression dating from childhood. (T. 238-39.) She complained of difficulty sleeping, nightmares, panic attacks several times a week, and possible hallucinations or delusions. (T. 238-43.) Dr. Moore diagnosed plaintiff with post-traumatic stress disorder, panic disorder with the beginnings of agoraphobia, generalized anxiety disorder, and major depressive disorder, which she described as "moderate" and including "psychotic features." (T. 242.) Dr. Moore listed plaintiff's prognosis as "guarded." *Id.*

Plaintiff began treatment with Psychologist, Dr. Scott-Richard, on July 15, 2015. (T. 272.) She continued to treat with her at least once a month until July 10, 2017, for a total of thirty-three appointments. (T. 272-349.) Dr. Scott-Richard indicated that plaintiff experienced symptoms consistent with major depressive disorder and PTSD and had reported a "clear history of trauma." (T. 272-74.) Much of Dr. Scott-Richard's treatment is dedicated to navigating plaintiff's cognitive distortions and managing the affects of trauma in plaintiff's life. (T. 272-349.) Dr. Scott-Richard noted that plaintiff had a "*very* difficult time leaving the house" (emphasis in original), sometimes experienced multiple panic attacks in a day, and had a history of suicidal ideation. (T. 273-76.)

Upon referral from Dr. Scott-Richard, plaintiff began treatment with Dr. Krilov on October 12, 2015. (T. 253-56.) Plaintiff saw Dr. Krilov thirty-two times between her

initial appointment and August 7, 2017. (T. 11, 250-58, 320.) Dr. Krilov prescribed an array of different medications to manage plaintiff's symptoms including Lexapro, Wellbutrin, Zoloft, Trazadone, Requip, and Xanax. *Id.* Like Dr. Scott-Richard, Dr. Krilov noted plaintiff's history of behavioral problems, domestic violence, homelessness, and incarceration. (T. 235-56.)

The ALJ's decision provides a detailed statement of the medical and other evidence of record. (T. 32-64.) Rather than reciting this evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

## IV.   **THE ALJ'S DECISION**

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity between the alleged onset of disability on of October 1, 2011 and her application date of April 15, 2015. (T. 19.) ALJ Bozarth noted that plaintiff last met the insured status requirements of the Social Security Act on June 30, 2015. *Id.* At step two, the ALJ found that plaintiff had five severe impairments: generalized anxiety disorder, major depressive disorder, bipolar disorder, PTSD, and panic disorder. *Id.* Plaintiff's obesity and plantar fasciitis were not described as causing any "exertional, postural, and manipulative limitations" and were considered non-severe. (T. 20.)

In making the step two determination, the ALJ found that, prior to June 30, 2015, plaintiff's mental impairments resulted in mild to moderate difficulties in interacting with others; at most moderate difficulties in maintaining concentration, persistence or pace; at most moderate difficulties in adapting or managing oneself; and no restriction in understanding, remembering, or applying information. *Id.* ALJ Bozarth based his

7

conclusion on Dr. Moore's evaluation of plaintiff and plaintiff's description of her lifestyle. *Id.* Specifically, ALJ Bozarth noted plaintiff's ability to cook, clean, do laundry, and travel. *Id.*

At step three, the ALJ found plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (T. 20-21.) At step four, ALJ Bozarth determined that plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, as long as she worked in "a low stress job which is one with occasional judgments, occasional decisions, and occasional changes to the work setting." (T. 21.) The ALJ found plaintiff "should work at simple, routine, and repetitive tasks" and "at low stress jobs, which are goal oriented rather than oriented toward production goals or on an assembly line." *Id.* ALJ Bozarth further specified plaintiff should "be in jobs that only require occasional contact with coworkers, the public, or supervisors" and should not work in a noise environment above "moderate" noise level. *Id.*

The ALJ found that plaintiff was unable to perform any of her past relevant work, which included positions as a telemarketer, home attendant, and crew leader. (T. 25.) He found that plaintiff's medically determinable impairments could reasonably be expected to produce her alleged symptoms, but that plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and the record. (T. 21-25.)

At step five, ALJ Bozarth found that plaintiff would be able to perform jobs that existed in significant numbers in the national economy. (T. 25.) This conclusion was

based on the testimony of VE Robin Cook. (T. 54-64.) The ALJ determined plaintiff

had not been under a disability from the alleged onset date of October 1, 2011 to her

DLI of June 30, 2015. (T. 26.)

## V.   ISSUES IN CONTENTION

Plaintiff raises the following arguments:

1.   The Appeals Council improperly refused to consider the opinion of plaintiff's treating psychiatrist, Dr. Krilov. (Pl.'s Br. at 8-10) (Dkt. No. 9).
2.   The ALJ and Appeals Council improperly refused to give Dr. Krilov controlling weight, and the ALJ improperly weighed the medical opinion evidence. (Pl.'s Br. at 10-21).
3.   Plaintiff cannot meet the basic mental demands of unskilled work. (Pl.'s Br. at 21-24).
4.   The ALJ's Step 5 determination is not supported by substantial evidence. (Pl.'s Br. at 24-25).

Defendant argues that the ALJ properly weighed the opinions of Drs. Krilov,

Moore, and Reddy, and that the ALJ properly rejected Dr. Krilov's opinion. (Def.'s Br.

at 4-16) (Dkt. No. 11).  Defendant further asserts that this court does not have

jurisdiction to consider the Appeal's Council's denial of review. (Def.'s Br. at 16-19).

Plaintiff has filed a reply brief. (Dkt. No. 14).  For the following reasons, this court

agrees with plaintiff and will remand this action for further proceedings before the

Commissioner.

## DISCUSSION

## VI.   RFC EVALUATION/TREATING PHYSICIAN

### A.   Legal Standards

#### 1.   RFC

RFC is "what [the] individual can still do despite his or her limitations.

Ordinarily, RFC is the individual's maximum remaining ability to do sustained work

activities in an ordinary work setting on a regular and continuing basis…" A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F. 2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. At 183; *Sullivan v. Secretary of HHS,* 666 F. Supp. 456, 460 (W.D.N.Y. 1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing SSR 96-8p, 1996 WL 374184, at *7).

## 2. Treating Physician

A treating source's opinion on the nature and severity of a claimant's impairments is entitled to controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence" of the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

This is known as the "treating physician rule." In *Estrella v. Berryhill*, the court emphasizes the importance of a treating source's opinion in cases concerning mental impairments, as "cycles of improvement and debilitating symptoms [of mental illness] are a common occurrence." *Estrella v. Berryhill*, __ F.3d __, No. 17-3247, 2019 WL 2273574, at *8 (2d Cir. 2019) (quoting *Garrison v. Colvin*, 759 F. 3d 995, 1017 (9ᵗʰ Cir. 2014)).

If an ALJ decides not to give the treating source's records controlling weight, then he must explicitly consider the four *Burgess* factors: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*, 2019 WL 2273574, at *6-7 (quoting *Burgess v. Astrue*, 537 F. 3d 117, 120 (2d Cir. 2008)). Should an ALJ assign less than controlling weight to a treating physician's opinion and fail to consider the above-mentioned factors, this is a procedural error. *Estrella*, 2019 WL 2273574, at *7. It is impossible to conclude that the error is harmless unless a "searching review of the record . . . assures us that the substance of the treating physician rule was not traversed." *Id.*

### B. Application

Plaintiff first argues that the "Appeals Council" improperly refused to consider the retrospective opinion of Dr. Krilov, plaintiff's treating psychiatrist, and that the ALJ and the Appeals Council erred in failing to give good reasons for not crediting the opinion of a treating physician. (Pl.'s Br. at 8-10) (citations omitted). Defendant argues that the court has no jurisdiction to consider the Appeals Council's denial of plaintiff's

request for review, and the court must focus only on the ALJ's decision.

If the Appeals Council denies review of a case, "the ALJ's decision, and not the Appeals Council's is the final agency decision." *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015). However, the court in *Lesterhuis* also held that when reviewing the Commissioner's decision, "[w]e 'review the entire administrative record ***which includes the new evidence***, and determine, as in every case, whether there is substantial evidence to support the decision of the [Commissioner].'" *Id.* (citing *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)) (emphasis added). *See also Westhoven v. Comm'r of Soc. Sec.*, No. 17-CV-1048, 2019 WL 1541053, at *6 (W.D.N.Y. Apr. 9, 2019) (recognizing that after *Lesterhuis*, the court must focus on the ALJ's decision and not the Appeals Council's denial of review, but considered the new evidence which was made part of the record by the Appeals Council in light of the entire record and remanded the case, after finding that "the ALJ's decision was not supported by substantial evidence - "especially in light of the new evidence from [the treating physician]."")[2]

The facts in *Lesterhuis* were similar to this case. In *Lesterhuis*, the court ultimately held that "on the facts of this case, the ALJ's decision was not supported by

---

[2] The court is well-aware that there are still district court opinions, decided after *Lesterhuis*, which focus on the Appeals Council's alleged error, rather than only on the ALJ's decision when determining that the Commissioner's decision was not supported by substantial evidence. *See e.g. Redic v. Comm'r of Soc. Sec.*, No. 18-CV-6225, 2019 WL 1512556, at *5 (W.D.N.Y. Apr. 4, 2019); *Durrant v. Berryhill*, No. 16-CV-6781, 2018 WL 1417311, at *4 (W.D.N.Y. Mar. 12, 2018) (cited by plaintiff). These cases still find that the court must consider all the evidence, including the evidence presented to the Appeals Council. *See Redic*, 2019 WL 1512556, at *3 (citing *Perez*, 77 F.3d at 46). However, in light of *Lesterhuis*, this court finds that the court's focus must be on the ALJ's decision. In any event, the result in this case is the same under either analysis because the new evidence would be subject to the treating physician rule.

substantial evidence because the new evidence contradicted the ALJ's conclusion in important respects." *Id.* The new evidence in *Lesterhuis* was a treating physician's report which was added to the record by the Appeals Council, even though the Appeals Council denied plaintiff's request for review. *Id.* The Second Circuit pointed out that the treating physician's opinion was to be given controlling weight, as long as it was well-supported by medically acceptable techniques and was not inconsistent with the other substantial evidence in the record.[3] *Id.*

In this case, on December 15, 2016, Dr. Krilov completed a "Questionnaire - Mental." (T. 301-302). In that questionnaire (a check-box form), Dr. Krilov found that plaintiff had "marked" limitations in all aspects of concentration and persistence, interaction with others, and in her ability to cope with stress. (*Id.*) She also found that plaintiff would be off-task more than 33% of the day and would be absent 3 or more days per month because of her mental impairments. (T. 302). In response to a question, asking about the bases for Dr. Krilov's opinion, she wrote: "see abstract produced by Dr. Scott-Richard." (T. 302).

The document, entitled "Original Abstract" is dated December 9, 2016. (T. 271).

---

[3] In addition, after *Estrella,* if the ALJ decides not to give the treating source's opinion controlling weight, then he must explicitly consider the four *Burgess* factors: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist" in order to determine what weight the treating physician's opinion should be given. *Estrella*, 2019 WL 2273574, at *6-7 (quoting *Burgess v. Astrue*, 537 F. 3d 117, 120 (2d Cir. 2008)). If the ALJ assigns less than controlling weight to a treating physician's opinion and fails to consider the above-mentioned factors, this is a procedural error. *Id.* at *7. In this case, the ALJ did not see the new evidence, thus the court would not assign error to the failure to explicitly discuss the *Burgess* factors with respect to the new evidence, but will consider whether the new evidence would have affected the ALJ's opinion in light of the appropriate factors.

In addition to an in depth discussion of plaintiff's background and condition, the abstract states that "[i]f this patient was attempting to seek or maintain employment at present, it is my opinion that her current mental health symptoms would likely result in serious occupational impairment." (T. 271). On December 18, 2016, Dr. Scott-Richard completed an identical questionnaire, with even more restrictive limitations, answering that in some functions, the plaintiff's limitations would be between "marked" and "extreme." (T. 318-19). The questionnaire completed by Dr. Krilov and the questionnaire and abstract written by Dr. Scott-Richard were both considered by the ALJ, as were a multitude of progress notes by Dr. Scott-Richard and several almost completely illegible progress notes written by Dr. Krilov. (T. 272-99, 323-25 (Dr. Scott-Richard's progress notes), T. 352-53, 248-58 Dr. Krilov's notes)).

The ALJ gave "limited weight" to the opinions of Dr. Krilov and Dr. Scott-Richard because they began treating plaintiff after the DLI, Dr. Krilov stated in her questionnaire that the "period covered" by her answers was October 2015 to "present" (T. 302), and Dr. Scott-Richard stated that the "period covered" by answers was July of 2015 to "present." (T. 319). Both of these dates are after the DLI. (T. 23). The ALJ then stated that, although Dr. Scott-Richard amended her opinion to state that plaintiff's symptoms existed before July 1, 2015 (T. 349), this was based "solely on the claimant's endorsed symptoms and not on objective findings." (*Id.*) The ALJ also stated that Dr. Scott-Richard did not cite objective findings to justify the "marked to extreme" limitations that she checked on her questionnaire. (*Id.*) The ALJ then cited Dr. Moore's June 11, 2015 report as conflicting evidence. Dr. Moore examined plaintiff and wrote her report a few weeks before Dr. Scott-Richard began treating plaintiff, noting that the

plaintiff was not "actively involved" in counseling, and that her medication "helped lessen her thoughts of self-harm." (*Id.*)

Essentially, the ALJ gave less weight to the treating psychiatrist and psychologist because they did not begin treating plaintiff until after her June 30, 2015 DLI (although July 15, 2015 was two weeks after her DLI) and due to the alleged lack of "objective findings." The ALJ instead relied upon Dr. Moore's one day consultative examination of plaintiff and on Dr. V. Reddy's[4] non-examining opinion, dated June 26, 2015. Though both Dr. Scott-Richard and Dr. Krilov began treating plaintiff shortly after her DLI,[5] each wrote an opinion regarding plaintiff's condition before the DLI. Dr. Scott-Richard explained her RFC evaluation on July 10, 2017, which was two years after she began treating plaintiff and when she would have had a clear idea of plaintiff's diagnoses and limitations. This report was considered by the ALJ. (T. 349-50). However, the ALJ did not accept this explanation because he believed that it was based only on plaintiff's "stated" symptoms. (T. 23, 349).

After the hearing, psychiatrist, Dr. Krilov, M.D., submitted a report, explaining her opinion, after reading Dr. Moore's consultative psychological report. (T. 11), Dr.

---

[4] Dr. V. Reddy, PhD is a non-examining State Agency psychologist who reviewed plaintiff's records in conjunction with the initial denial of benefits and conducted a step three analysis to determine if plaintiff met a listed impairment. (T. 68-75). Dr. Reddy reviewed only Dr. Moore's psychological report. (T. 71, 73).

[5] Dr. Scott-Richard and Dr. Krilov work in the same office and clearly work together, as evidenced by Dr. Krilov's reference to Dr. Scott-Richard's "abstract" as part of the basis for Dr. Krilov's RFC evaluation. As a discrepancy, the ALJ cited Dr. Scott-Richard's statement that plaintiff's symptoms began in July 2015, while Dr. Krilov stated that her symptoms began in October of 2015. This is not a discrepancy, but is merely indicative of the first time that each provider saw the plaintiff. Dr. Krilov's notes do not begin until October. At the time each provider completed the form in question, she may not have been aware of the significance of the onset date.

Krilov gave a very specific retrospective opinion of plaintiff's condition prior to the DLI: "Clearly the level of severity of [plaintiff's] condition, as set forth in my evaluation, was at least as bad in June of 2015. Therefore, I do believe the limitations set forth in my questionnaire would have existed on or before June 30, 2015, and would have precluded [plaintiff's] ability to work."[6] (T. 11.)  Dr. Krilov's August 7, 2017 Addendum was submitted to the Appeals Council for its review, together with a copy of the December 15, 2016 Questionnaire, containing "marked" limitations in many categories as outlined above. (T. 11-13).

The Appeals Council declined to give Dr. Krilov's August 7, 2017 addendum any weight because it "does not relate to the period at issue" and thus "does not affect the decision about whether [plaintiff] [was] disabled beginning on or before June 30, 2015." (T. 2.)  Aside from the obvious factual error which this court need not consider - that Dr. Krilov's note *does* relate to the period before June 30, 2015,[7] and specifically states that plaintiff's limitations existed on or before plaintiff's DLI, this court finds that based on the entire record, including Dr. Krilov's August 7, 2017 opinion, the ALJ's decision is not supported by substantial evidence. (T. 11.)

ALJ Bozarth assigned the opinions of both treating sources, Drs. Krilov and Scott-Richard, "limited weight." (T. 23.) The ALJ based this decision on the dates of

---

[6] The court is well-aware that Dr. Krilov's opinion about plaintiff's "ability to work" in general is a finding that is reserved for the Commissioner.  The court's finding is based only on the statements of plaintiff's limitations, not the ultimate conclusion. *See Wright v. Berryhill*, 687 F. App'x 45, 48 (2d Cir. 2017) ("the legal determination of whether an individual is eligible to receive disability insurance benefits is reserved to the Commissioner").

[7] Whether Dr. Krilov's opinion is correct or supported by the medical evidence is a separate issue.  Dr. Krilov clearly intended to state that her opinion related to the period at issue.

the records, which are after plaintiff's DLI and because Dr. Scott-Richard did not identify objective abnormal findings to support the 'marked' to 'extreme' limitations she identified." *Id.* The ALJ did not consider the *Burgess* factors. Defendant argues that Dr. Krilov's addendum would not have changed the ALJ's decision because the ALJ had already discussed how the pre-June 2015 evidence contradicted the limitations in Dr. Krilov's opinion. The ALJ found that Dr. Moore's findings contradicted Dr. Krilov's opinion. However, Dr. Krilov, a psychiatrist and medical doctor, specifically cited Dr. Moore's (a psychologist) opinion in the August 7, 2017 submission and stated that the limitations in her December 2016 questionnaire were *consistent* with Dr. Moore's report. (T. 11).

While Dr. Moore found that plaintiff had some mild functional impairments, she also found that plaintiff had "moderate *to* marked" impairments in dealing with stress, relating appropriately with others, making work-related decisions, and maintaining a regular schedule. (T. 241-42) (emphasis added). The "moderate to marked" impairments are related to activities that would be associated with the ability to hold a job. Although the ALJ specified that he considered these limitations when he developed plaintiff's RFC, he neglected to note that the treating providers both found "marked" limitations in those areas. Dr. Krilov and Dr. Scott-Richard's opinions that these limitations were "marked" is consistent with Dr. Moore's opinion that the limitations were "moderate to marked."[8]

---

[8] Dr. Moore's references to the claimant having "fair" hygiene, "normal" motor behavior, "adequate" language abilities, and being "coherent" do not necessarily outweigh Dr. Moore's later notes that plaintiff suffers from posttraumatic stress disorder, major depressive disorder, panic disorder with the beginnings of agoraphobia, and generalized anxiety disorder. (T. 240-42.)

ALJ Bozarth gave "some weight" to the opinions of Drs. Moore and Reddy. (T. 22.) Dr. Moore saw plaintiff once, and Dr. Reddy reviewed Dr. Moore's notes about the plaintiff, but did not examine her. (T. 71). As stated in *Estrella*, the court has "frequently cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination . . . . This is even more pronounced in the context of mental illness where … a one-time snapshot of a claimant's status may not be indicative of her longitudinal mental health." *Estrella*, 2019 WL 2273574, at *8 (internal quotations omitted). This is exactly what ALJ Bozarth did in giving Dr. Moore and Dr. Reddy's opinions greater weight than those of Drs. Krilov and Scott-Richard. (T. 22-23.) By the time that Dr. Krilov submitted her addendum, she had been treating plaintiff for approximately two years, on a frequent basis and is a specialist in the area of psychiatry. While conflicting opinions from other medical experts may form the basis for discrediting a treating physician, 'not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician.'" *Flynn*, 729 F. App'x at 121.

Though the ALJ took issue with the date of plaintiff's treatment with Dr. Krilov, the retrospective diagnosis of a treating physician is "entitled to controlling weight unless it is contradicted by other medical evidence or overwhelmingly compelling non-medical evidence." *Byam v. Barnhart*, 336 F. 3d 172 (2d Cir. 2003). Because Dr. Krilov's opinion as a treating psychiatrist was not contradicted by any other *examining* physicians, this means her retrospective opinion is entitled to controlling weight unless the ALJ engages in the appropriate analysis. The ALJ failed to adequately explain his reasoning for prioritizing the opinion of a non-treating, non-examining physician who

had access to only a sliver of plaintiff's medical record over the opinion of plaintiff's treating psychiatrist, who she saw at least thirty-two times in three years, even though these examinations took place after plaintiff's DLI. If the ALJ had Dr. Krilov's addendum, a proper review of the *Burgess* factors would lean heavily toward giving the opinion greater weight.[9]

Defendant argues that the ALJ was correct in citing to the "paucity of formal mental health treatment notes prior to the date last insured," which further corroborates Dr. Reddy's opinion and the ALJ's finding. (T. 22; Dkt. No. 11 at 9.) However, plaintiff was treated by her primary care providers for depression prior to the DLI. On February 2, 2015, she was examined by Nurse Christine Fassett, MOA and NP Robbins. (T. 230). Plaintiff reported that functioning was very difficult, she had anxious/fearful thoughts, depressed mood, difficulty concentrating, and several other symptoms. (T. 230). Nurse Fassett stated that plaintiff's depression was aggravated by lack of sleep and traumatic memories. (T. 230). Plaintiff had already been prescribed Zoloft for her depression. (T. 233). Plaintiff's "Patient Health Questionnaire" indicated "Moderate Depression." (T. 230-32). Plaintiff's medication was helping, but NP Nichols started plaintiff on Wellbutrin. (T. 235).

On March 6, 2015, plaintiff was seen by NP Nichols for "depression" and vitamin D deficiency. (T. 226.) NP Nichols stated that the depression was aggravated

---

[9] By the time that Dr. Krilov issued the August 7, 2017 opinion, she and/or Dr. Scott-Richard had been treating plaintiff for approximately two years. Thus, under the *Burgess* factors, the length and nature of the treating relationship weighs in favor of the doctor's August 7, 2017 addendum. The amount of medical evidence was substantial by 2017. Although the ALJ stated that the addendum was "inconsistent" with the other medical evidence, Dr. Krilov did not believe so, and Dr. Krilov is medical doctor, specializing in psychiatry. The *Burgess* factors weigh in favor of giving the treating physician greater weight than the ALJ originally afforded the opinion.

by conflict or stress and stress of children, and that the "relieving factors" were "medication." (*Id.*) NP Nichols found that plaintiff had anxiety, depression, and was easily startled. (T. 228). Although on physical examination, NP Nichols found that plaintiff was "oriented," had appropriate mood and affect, normal insight, normal judgment, and no suicidal ideation, the "problem list" included symptoms of depression, dating back to September 26, 2012. (T. 226, 228).

The lack of earlier evidence of mental health "treatment" may ultimately affect the plaintiff's alleged onset date. However, the temporal proximity of Dr. Scott-Richard's and Dr. Krilov's initiation of treatment of the plaintiff to the DLI, and their opinion that the symptoms existed before the DLI may still support a finding of disability as long as the disabling symptoms began prior to the DLI.

## VII.    REVERSAL OR REMAND

### A.    Legal Standards

Remand to the Commissioner for further development of the evidence is appropriate when there are gaps in the administrative record or where the ALJ has applied an improper legal standard. *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999). Reversal for calculation of benefits is appropriate only if the record contains persuasive proof of disability and a remand for further evidentiary proceedings would serve no useful purpose. *Id.*

### B.    Application

In this case, the ALJ did not follow the treating physician rule concerning Dr. Krilov's retrospective opinion and failed to explicitly consider the *Burgess* factors in this decision. Without proper weighing of plaintiff's medical records, it is impossible to

accurately determine plaintiff's RFC and, subsequently, her ability at step five to perform work in the national economy. *Estrella*, No. 17-3247, 2019 WL 2273574, at *7. Therefore, remand is required to weigh the medical evidence, formulate a correct RFC from that medical evidence, determine whether plaintiff was disabled, and potentially, the date of onset of any disability.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Commissioner's decision is **REVERSED,** and it is

**ORDERED**, that this case **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), for a proper evaluation of the medical evidence, an appropriate determination of plaintiff's residual functional capacity, and other further proceedings, consistent with this Memorandum-Decision and Order, and it is

**ORDERED**, that the Clerk enter judgment for the **PLAINTIFF**.

Dated: July 8, 2019

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**